# EXHIBIT 1

*United States Senate*　　　　　　　　　*Michael B. Enzi, Chairman*
<u>COMMITTEE ON HEALTH, EDUCATION, LABOR AND PENSIONS</u>

# *"Opportunities for Too Few? Oversight of Federal Employment Programs for Persons with Disabilities"*

REPORT OF THE CHAIRMAN
ON
FEDERAL PROGRAMS FOR EMPLOYMENT OF
PERSONS WITH DISABILITIES



**OCTOBER 20, 2005**

# Opportunities for Too Few?

*Oversight of Federal Employment Programs  
For Persons with Disabilities*

## *Executive Summary*

### Background

Nearly seventy years ago, Congress passed The Randolph-Sheppard Act and The Javits-Wagner-O'Day Act to increase the number of employment opportunities available to persons with disabilities in an effort to help them become more self sufficient. Since that time, the law, public policy and social norms about persons with disabilities has changed.

Institutionalization, once the norm, is now discouraged and individual choice and mainstreaming have been emphasized. The HELP Committee investigation, begun in May 2005, focused on the level of support currently provided by the programs authorized by both laws and the importance of enacting additional legislation to provide better and more focused employment opportunities for persons with disabilities.

### Current Status

**The Randolph-Sheppard (R-S) Act** gives certain persons who are legally blind (licensed blind vendors) training, support and a priority to fulfill certain government food service contracts. This stems from the provisions of the original law which allowed persons who are blind to establish vending stands in government office buildings. Over the years, the law was amended and changed to include cafeterias so that the law now provides a priority for the blind to fulfill the contracts of cafeterias on military installations across the country. Although the original purpose of the law was to help blind persons obtain competitive employment, it has made a select few of them wealthy and done little if anything for the vast majority. As the program currently operates:

- Only a select few licensed blind vendors are able to capture the financial windfalls that are available from the program by offering successful bids for pending contracts.

- These few licensed blind vendors are then able to hire employees or subcontractors to help fulfill the terms of what are often large, lucrative contracts. Thousands of employees are ultimately hired by the vendor or subcontractor but very few of these hires are blind persons.

As noted, Randolph-Sheppard has always been intended to help those who are legally blind. It categorically excludes those who are visually impaired, or those who have hearing, mobility, intellectual or other disabilities. Although the program is specifically directed at a population with very high unemployment numbers, only a relative handful are reaping the benefits and receiving the support this program provides.

2

**The Javits-Wagner-O'Day (JWOD) Act** was written to address the needs of those living with any severe disability. It requires the federal government to make its purchases of certain goods and services from organizations with a 75 percent rate of direct labor being performed by persons living with disabilities. Through the years, the law has created incentives to hire and retain those living with disabilities. Unfortunately, it has created disincentives for those with disabilities to move into the mainstream.

Very few workers have moved out of employment covered by the Javits-Wagner-O'Day Act and into competitive employment. While competitive employment may not be an option for all those with disabilities, the Javits-Wagner-O'Day Act was not designed to help them make informed choices or to help them build the skills they might need to make such a transition.

**Possible Legislative Alternatives**

Based upon the Committee's findings, it is clear that too few persons with disabilities obtain employment opportunities under these two federal programs that will enable them to move into competitive employment. As part of the Committee's oversight responsibilities, the Committee will begin to consider legislative and other alternatives for improving these federal programs. Possible alternatives to be considered to improve these federal programs include:

- Combine Randolph-Sheppard and Javits-Wagner-O'Day into a single program. Streamlining and placing both programs into one line of command and oversight may help increase the efficiency and effectiveness of both programs and increase the opportunities provided for those living with disabilities.

- Include all persons living with disabilities in the combined program. Options and resources should be based on individual needs instead of disability categories and generalizations.

- Create incentives and opportunities for integrated, competitive employment (e.g., supported employment, micro-enterprise and customized employment). The more employment opportunities that are created, the more individuals the combined programs will be able to assist. An increase in the number of employment opportunities that are available to persons with disabilities will help fulfill the original intent of Congress.

- Provide training and job placement consistent with a person's capabilities and goals

- Require accountability, based on outcomes. These programs as currently administered need greater oversight and accountability. As these programs are reformed and modified to make them more accessible and effective, oversight will have to increase to ensure funds are being used efficiently and effectively.

3

I. Introduction

This report presents the evidence gathered by the U.S. Senate Health, Education, Labor and Pensions (HELP) Committee establishing the completion of the long overdue congressional oversight of the "Randolph-Sheppard Act" (R-S) and Javits-Wagner-O'Day Act" (JWOD)– the first such review in nearly 70 years.

Randolph-Sheppard and Javits-Wagner-O'Day are procurement set-asides that were established for the benefit of persons with disabilities.

- Randolph-Sheppard is intended to benefit persons who are legally blind by providing them (licensed blind vendors) with training, support and rights to certain federal food service opportunities.

- Javits-Wagner-O'Day is intended to benefit persons with any severe disability. It requires the federal government to make its purchases of certain goods and services from organizations, 75 percent of whose "direct labor" is performed by persons with disabilities.

**The HELP Committee investigation focused on 4 major questions surrounding the Randolph-Sheppard and Javits-Wagner-O'Day laws:**

- What outcomes does the Randolph-Sheppard law produce?

- What outcomes does the Javits-Wagner-O'Day law produce?

- Do these laws fulfill their Congressional intent?

- How can these programs be made more effective and more efficient?

II. Background

A. The "Randolph-Sheppard Act"

Before the "Randolph-Sheppard Act," the institutionalization of blind persons was the norm. Persons who were blind were placed in special schools and workshops, where they learned and performed vocational tasks thought suitable for persons who were blind, notably chair-caning and piano tuning.

Enacted in 1936, the Randolph-Sheppard Act gave contracting priority to legally blind persons with no better than 20/200 vision to operate vending facilities, cafeterias, carts, shelters and counters on federal property. The Department of Education, through the Commissioner of the Rehabilitative Services Administration, administers Randolph-Sheppard at the federal level. State licensing agencies secure vending rights,

4

license such vending rights to individuals who are blind, and assist licensed blind vendors to achieve their "maximum vocational potential."

In practice however, Randolph-Sheppard gives huge financial windfalls to a few licensed blind vendors. For example –

- Licensed blind vendors control 39 military cafeteria contracts with an approximate total dollar value of $1.203 billion. [1]

- Individual licensed blind vendors are entitled to the lion's share of profits from:

    ✓ $306 million Ft. Benning cafeteria contract. [2]

    ✓ $113 million Ft. Jackson cafeteria contract. [3]

    ✓ $86 million Lackland Air Force Base cafeteria contract. [4]

    ✓ $72 million Ft. Knox cafeteria contract. [5]

    ✓ $51 million Ft. Bliss cafeteria contract. [6]

    ✓ Other large military cafeteria contracts. [7]

Additionally, very few people who are blind get jobs through Randolph-Sheppard programs, and that total keeps shrinking.

- In 1974, there were approximately 3,400 licensed blind vendors. [8]

- In 2004, there were 2,681 licensed blind vendors, which is less than 1 percent of the approximately 350,000 unemployed persons of working age who are legally blind. [9]

---

[1] Department of Defense CD-ROM, "Randolph-Sheppard Contracts, Javits-Wagner-O'Day Contracts, OUSD (AT&L)/DPAP, August 26, 2005," produced in response to HELP Committee Request for Information.
[2] Ibid.
[3] Ibid.
[4] Ibid.
[5] Ibid.
[6] Ibid.
[7] Ibid.
[8] HELP Committee Staff interviews with James McCarthy and James Gashel, National Federation of the Blind, and Robert Humphreys, current counsel to the Randolph-Sheppard Vendors of America and former Commissioner of the Rehabilitative Services Administration.
[9] Department of Education Randolph-Sheppard Act 2002 Report. Fiscal Year 2002 is the most recent year for which the Department of Education can provide official statistics.

5

To perform many contracts, licensed blind vendors must hire subcontractors or employees. In 2002, the most recent year for which the Department of Education has statistics, a total of 2,681 licensed blind vendors and their subcontractors employed:

- ✓ 337 persons who are blind
- ✓ 278 persons with other disabilities
- ✓ 6,507 persons with no disabilities.[10]

That is, less than 5 percent of employees hired in the Randolph-Sheppard program are blind. This is a cause for concern in a program designed to create jobs for persons who are blind. (Note that less than 9 percent of the employees hired by licensed blind vendors are blind or have some other disability.)



**B. The "Javits-Wagner-O'Day Act"**

The Wagner-O'Day Act, enacted in 1938, required the federal government to make its purchases of brooms, mops and other specified commodities from organizations, 75 percent of whose direct laborers were blind. In 1971, Senator Jacob Javits (R-NY) fought to include individuals with other severe disabilities in the law. The amended law is the "Javits-Wagner-O'Day Act."

When Senator Javits helped individuals with intellectual and other severe disabilities get jobs, it was a big step forward. In 1971, it was considered an accomplishment for a person with a severe disability to have a job, even if the job was not in the open market. Without that job, they would likely sit at home or languish in an institution.

---

[10] Department of Education Randolph-Sheppard Act 2002 Report.

6

Since then, law, policy and conventional wisdom regarding the limitations of individuals with intellectual and other severe disabilities have evolved. Since Javits-Wagner-O'Day's enactment –

- Congress, through the "Americans with Disabilities Act (ADA), "Individuals with Disabilities Education Act" (IDEA) and "Rehabilitation Act" reauthorizations of 1992 and 1998, has mandated equal access, inclusion, choice, anti-discrimination and control by individuals with disabilities over their own lives.

- The Supreme Court in its Olmstead decision held that unnecessary segregation of individuals with disabilities is an impermissible form of discrimination.

- President Bush, through the New Freedom Initiative, has torn down barriers to the competitive workplace and promoted full access and integration.

Javits-Wagner-O'Day, however, has not kept pace with changes in the law and society concerning individuals with disabilities, keeping them out of the mainstream and reinforcing unhealthy stereotypes.



### III. Federal Oversight of Randolph-Sheppard: The Department of Education

The HELP Committee's investigation revealed that the Department of Education (DOE), the federal agency responsible for administering Randolph-Sheppard, does not know how many licensed blind vendors, employees who are blind, employees with other disabilities, and employees with no disabilities participate in the Randolph-Sheppard program now, or were participating in 2004, or in 2003.

7

The Department of Education does not know, with respect to any Randolph-Sheppard contract:

- Who the blind vendor is
- Who the customer is
- Where the customer is located
- Whether there is a subcontractor
- What type of work is done
- Whether it is actually performed
- When contracts were signed and when they expire
- How much money is earned

The Randolph-Sheppard program's poor performance has led to a lawsuit by the National Federation of the Blind that was filed on September 19, 2005.[11] The suit alleges that the DOE fails to administer Randolph-Sheppard as required by law. Without commenting on the merits of the lawsuit, it is clear that the Department of Education's stewardship of Randolph-Sheppard programs has been ineffective:

- There has been an approximately 25 percent drop in the number of licensed blind vendors over the past 30 years.

- Less than 5 percent of persons hired in the Randolph-Sheppard program are blind.

- The Department has little information or control.

- Over time, many opportunities have been lost. For example, many government office buildings contain large food courts. The HELP Committee found none that provide opportunities to licensed blind vendors.

### IV. Randolph-Sheppard and "Entrepreneurialism"

Licensed blind vendors defend their right to hire as they see fit and capture financial windfalls and insist that the purpose of the Randolph-Sheppard Act is to create blind "entrepreneurs," who are entitled to become rich. The word "entrepreneur" is not in the statute. No Member of Congress has ever used the word "entrepreneur" in debating the Randolph-Sheppard Act. In the entire 70 year legislative history of the Randolph-Sheppard Act, the word "entrepreneur" is used once, on page 15 of a 1974 committee report.[12]

---

[11] NFB and affiliated persons filed suit on Friday, September 16, 2005 in the Federal District Court for the District of Columbia against Secretary Spellings and one of her subordinates.

[12] Congressional Research Service produced all documents constituting the Act's legislative history at the request of HELP Committee Staff.

8

V. "Triple-Dipping"

After taking full advantage of federal contracting priorities and state licensing agencies (SLAs) benefits, licensed blind vendors then "triple-dip" to maximize their revenue from the government. They (1) treat the estimated value of goods and services they receive from SLAs as unincurred business expenses, then (2) deduct such expenses from their income for the purpose of receiving Social Security Disability Insurance (SSDI).

Triple-dipping is common. For example, a July 2002 Report of the South Carolina Legislative Audit Council found that more than 3 out of every 4 licensed blind vendors in South Carolina received SSDI, receiving an average of $959 per month. That is an average of $11,508 a year.[13] SSDI usually goes to those who can't work because of their disabilities. Licensed blind vendors have jobs but receive - essentially – disability unemployment checks reimbursing them for costs they did not actually incur.

The National Federation of the Blind (NFB) has marketed triple-dipping as a revenue enhancer. A how-to primer in the February 1987 issue of *The Braille Monitor*, NFB's monthly magazine, instructs NFB members how to exploit the legal loophole, commenting that "whether one agrees or disagrees" with the law "is not really relevant. The law is the law."[14] Triple-dipping is not illegal or fraudulent, but underscores the extent to which licensed blind vendors depend on government.

**Randolph-Sheppard Programs Do Not Fulfill Congressional Intent**

Randolph-Sheppard does not "maximize the vocational potential" of persons who are legally blind.

- It perpetuates dependence on government for less than 1 percent of all unemployed persons of working age who are legally blind.

- It funnels them into a narrow government food services niche.

- It unfairly produces a few millionaires rather than encouraging the growth of jobs for the blind.

VI. Federal Oversight of Javits-Wagner-O'Day

The Committee For Purchase From Persons Who Are Blind Or Severely Disabled (CFP) comprises 15 Presidential appointees, 11 of whom represent government agencies and 4 of whom are private citizens. CFP's main job is to maintain a procurement list and

---

[13] For example, one licensed blind vendor in South Carolina deducted from income for SSDI purposes: approximately $38,000 in equipment and $2,000 in merchandise paid for by the State, $6,421 in administrative services provided by the State, and $7,000 in "supplier discounts."
[14] *The Braille Monitor*, February 1987.

9

set prices. The procurement list itemizes goods and services suitable for production by individuals with disabilities. There are currently 11,385 products and services on the Javits-Wagner-O'Day procurement list.

### VII. Javits-Wagner-O'Day – Undesirable Employment Outcomes

Javits-Wagner-O'Day is a "contract-first" program. It is a first and foremost a procurement set-aside law. It leverages the federal government's purchasing power, creating incentives for nonprofits to hire persons with disabilities. A nonprofit enterprise wins a Javits-Wagner-O'Day contract and then it is their responsibility to hire persons with disabilities to remain eligible and to fulfill the contract. A Javits-Wagner-O'Day contract sets forth a nonprofit's duties to a customer, not its duties to persons with disabilities.

Javits-Wagner-O'Day is not a "person first" program. It was not designed primarily as a special education, rehabilitation, or vocational training program. The law was designed to create jobs for persons with disabilities.

Unfortunately, the law was not designed to mainstream persons with disabilities. The law was designed to keep workers in Javits-Wagner-O'Day, not help them move out. The statute requires 75 percent of a Javits-Wagner-O'Day contract's "direct labor" to be performed by persons with disabilities. Thus, the incentive is to keep workers with disabilities in the direct labor pool, not promote or outplace them.

Supervisors want to keep their best workers, not mainstream them. Javits-Wagner-O'Day workers' disabilities can significantly reduce their productivity. Productive workers, who could probably work in "normal" jobs, are disproportionately valuable in a Javits-Wagner-O'Day setting. They compensate for their less productive coworkers. To satisfy Javits-Wagner-O'Day customers' often-demanding specifications, it makes sense for supervisors to keep their best workers, not help them move up and out.

Nonprofits participating in the program create jobs for individuals with disabilities, but don't help them move up and out of Javits-Wagner-O'Day into "normal" jobs.[15]

| Fiscal Year | Jobs | Outplacements | Outplacement Rate |
|---|---|---|---|
| 2001 | 37,102 | 2,340 | 6.3 percent |
| 2002 | 38,882 | 2,587 | 6.7 percent |
| 2003 | 41,969 | 2,448 | 6.2 percent |
| 2004 | 45,303 | 2,370 | 5.2 percent |

The number of Javits-Wagner-O'Day jobs increased 22 percent from 2001 to 2004. The outplacement rate fell 1 percent from 2001 to 2004.

---

[15] Data shown in table comes from "Javits-Wagner-O'Day Program Facts and Figures" sheet, distributed by the Committee For Purchase From Persons Who Are Blind Or Severely Disabled, 2005.

10



Also, 501(c) (3) executives can exploit Javits-Wagner-O'Day contracts for financial gain. There are no financial incentives to mainstream persons with disabilities. There are numerous examples of excessive executive compensation, lavish perquisites, conflicts of interest and self-dealing. A few examples:

- Social Vocational Services, Inc. (California)[16]
    - ✓ Paid its CEO $369,000 per year.
    - ✓ Paid its CFO (CEO's wife) $274,000 per year.
    - ✓ Paid the couple a total of $673,000.
    - ✓ $1.3 million in vans leased from entity under common control.
    - ✓ $98,000 of office space leased from entity under common control.

- National Center for the Employment of the Disabled (NCED) (Texas)[17]
    - ✓ Paid CEO no salary.
    - ✓ Paid CEO's consulting company $4.6 million.
    - ✓ Loaned $1.6 million to CEO's consulting company.
    - ✓ Pledged assets in exchange for discounted CEO Lear jet travel.
    - ✓ Entered into stock swaps with CEO.
    - ✓ Paid $2 million to a construction company controlled by NCED Director

- ORC Industries (Wisconsin)[18]
    - ✓ Paid CEO $680,000 per year.
    - ✓ Leased $47,000 office space from CEO.

---

[16] Social Vocational Services, Inc. 2002 IRS Form 990, most recent year publicly available. Spousal relationship verified by HELP Committee Staff phone call.
[17] National Center for the Employment of the Disabled 2003 IRS Form 990, most recent year publicly available.
[18] ORC Industries, Inc. 2003 IRS Form 990, most recent year publicly available.

11

- The Chimes (Maryland) [19]
    - ✓ Paid CEO $715,000 per year.
    - ✓ $988,000 transport contract with entity under common control.
    - ✓ $910,000 vehicle lease with entity under common control.
    - ✓ $15,000 personal services contract with Chimes Director (who is also an employee of Chimes' main lender).

- Pride Industries (California)[20]
    - ✓ CEO earns $594,000 a year in salary and benefits

The above CEO salaries are substantially higher than national average salaries of CEOs at similarly-sized, similarly-situated sheltered employment nonprofits.



### The Javits-Wagner-O'Day Program Does Not Fulfill Congressional Intent

Javits-Wagner-O'Day creates many jobs for persons with disabilities, but does not help them obtain competitive employment. This outcome is inconsistent with current laws such as the IDEA, ADA, and Rehabilitation Acts, policies and social norms, all of which encourage the integration of persons with disabilities. In addition, CEO abuses raise the question of why, when the "Sarbanes-Oxley Act" requires a greater

---

[19] The Chimes, Inc. 2003 IRS Form 990, most recent year publicly available. This is only the amount of publicly disclosed compensation. The Chimes also allegedly failed to disclose $2.44 million paid to its top three executives over three years, according to a story in the *Baltimore Sun* ("Disclosure At Chimes Puts Donors In Dark," October 22, 2003).

[20] Pride Industries, Inc. and Pride Industries One, Inc. 2002 IRS Form 990, most recent year publicly available.

12

accountability of public company CEO's, the Javits-Wagner-O'Day law does not require greater accountability for its CEO's.

### VIII. Possible Legislative Alternatives

Based upon the Committee's findings, it is clear that too few persons with disabilities obtain employment opportunities under these two federal programs that will enable them to move into competitive employment. As part of the Committee's oversight responsibilities, the Committee will begin to consider legislative and other alternatives for improving these federal programs. Possible alternatives to be considered to improve these federal programs include:

- Combine Randolph-Sheppard and Javits-Wagner-O'Day into a single program. Streamlining and placing both programs into one line of command and oversight may help increase the efficiency and effectiveness of both programs and increase the opportunities provided for those living with disabilities.

- Include all persons living with disabilities in the combined program. Options and resources should be based on individual needs instead of disability categories and generalizations.

- Create incentives and opportunities for integrated, competitive employment (e.g., supported employment, micro-enterprise and customized employment). The more employment opportunities that are created, the more individuals the combine programs will be able to assist. An increase in the number of employment opportunities that are available to persons with disabilities will help fulfill the original intent of Congress.

- Provide training and job placement consistent with a person's capabilities and goals

- Require accountability, based on outcomes. These programs as currently administered need greater oversight and accountability. As these programs are reformed and modified to make them more accessible and effective, oversight will have to increase to ensure funds are being used efficiently and effectively.