**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATIONAL FEDERATION OF THE** | ) | |
| **BLIND, INC.** *et al* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 05-1839  (CKK) |
| | ) | |
| **MARGARET SPELLINGS,** | ) | |
| **SECRETARY, U.S. DEPARTMENT OF** | ) | |
| **EDUCATION,** *et al.* | ) | |
| **Defendants** | ) | |
| | ) | |

**REPLY MEMORANDUM TO PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**AND DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS**

The Defendants, through counsel, the United States Attorney for the District of Columbia, respectfully submit this memorandum both as a reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss and as a supplement in further support of Defendants' Motion to Dismiss. Plaintiffs' suit fails to satisfy the fundamental requirements for seeking mandamus relief.  Moreover, Plaintiffs have failed to set forth an injuries in fact and are attempting to advance a suit that is not a true case or controversy.  By focusing on staffing as the improper agency action, Plaintiffs' claims of harm are based on rank speculation and seek to compel an act committed to agency discretion – how to satisfy dated congressionally directed staffing requirements.

Moreover, the Complaint should be dismissed because Plaintiffs cannot satisfy the final two prongs of the three-part standing test.  Specifically, by misconstruing the role and the responsibility of the Rehabilitation Services Administration (RSA), Plaintiffs have not demonstrated that their

injuries are fairly traceable to actions by the Defendants, nor have they alleged that the harm on

which they base their suit can be redressed by the relief sought.

## DISCUSSION

A.    **This Court Lacks Jurisdiction Because Plaintiffs Fail to Satisfy the Fundamental Requirements for Mandamus Relief**

As stated by the Court in <u>Liberty Fund, Inc. v. Chao</u>, 394 F.Supp.2d 105 (D.D.C. 2005),

The Mandamus Act states that 'the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.'  28 U.S.C. § 1361.  Pursuant to the Act, a court may grant mandamus relief if '(1) the plaintiff has a clear right to relief;  (2) the defendant has a clear duty to act;  and (3) there is no other adequate remedy available to the plaintiff.'

<u>Id</u>. at 113, quoting <u>In re Medicare Reimbursement Litig.</u>, 414 F.3d 7, 10 (D.C.Cir.2005) and citing

<u>Ganem v. Heckler</u>, 746 F.2d 844, 852 (D.C.Cir.1984) (noting that mandamus is "an extraordinary

remedy [that] generally will not issue unless" these requirements are met) (citing <u>Heckler v. Ringer</u>,

466 U.S. 602 (1984)).  An issuance of a writ of mandamus remains committed to the discretion of

the court, even when a duty is clear and undisputed. <u>Public Citizen v. Kantor</u>, 864 F.Supp 208, 212-

213 (D.D.C. 1994) (*citing* <u>Cartier v. Sec. of State</u>, 506 F.2d 191, 199 (D.C.Cir.1974), *cert.*

*denied,*421 U.S. 947 (1975)).[1]

" '[A] "drastic" remedy, "to be invoked only in extraordinary situations," '[2] mandamus is

inappropriate except where a public official has violated a 'ministerial' duty." <u>Consolidated Edison</u>

---

[1]  While it appears that <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322, 1327 (D.C.Cir. 1996), authorizes jurisdiction for a mandamus claim in the nature of relief under the Adminsitrative Procedure Act, Plaintiffs' claims suffer other defects that are just as fatal, as if no such authority existed.

[2]  <u>In re Papandreou</u>, 139 F.3d 247, 249 (D.C. Cir. 1998) (quoting <u>Kerr v. U.S. Dist. Court</u>, 426 U.S. 394 (1976),

Co. of N.Y. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (citation for quote in note).  The Court in Consolidated Edison further describes such a "ministerial duty" as one that is " 'so plainly prescribed as to be free from doubt and equivalent to a positive command . . ..' " Id., quoting Wilbur v. United States, 281 U.S. 206, 218-219 (1929).  Where the duty "'depends on a statute or statutes the **construction or application of which is not free from doubt**, it is regarded as having the character of judgment or discretion which cannot be controlled by mandamus.' " Id. (emphasis added).

Here, Plaintiffs identify as their source of harm the failure of the Department of Education ("EDD") "to fulfill its statutory duty to ensure that the state licensing agencies are permitted to compete for [cafeteria-related contracts] as is required under the Randolph-Sheppard Act [("R-S Act")]." Pls Opp. at 7-8.  This alleged omission by EDD is not linked to a particular federal official whose job it was to take action.  The relief requested is not for EDD to insure that state licensing agencies are able to compete.  Rather the omitted action is linked to a thirty-two-year-old, legislatively directed staffing requirement that simultaneously gives discretion to the Secretary to reevaluate the program, and the relief requested is, again, not linked directly to competition for contracts but to satisfying the staffing requirement.  Yet, Plaintiffs offer (1) no connection between the failure to comply with the 32 year old staffing requirement and competition and (2) no connection between compliance with the staffing requirement now and future competition for contracts.  Plaintiffs do not allege that the staffing levels were the cause of the inability of state agencies to compete for contracts or allege that full staffing will enhance state agencies' ability to compete for contracts.  Plaintiffs do not, by their allegations, negate the possibility that policy

reasons or, even, incompetence, were the cause of the problem. We address this issue further below in our discussion of Plaintiffs' failure to satisfy Article III standing requirements.

More to the point, given that Plaintiffs concede that the R-S Act gives EDD discretion to "periodically [evaluate] the program and [take] **such other steps as may be necessary or desirable to carry out the program** (20 U.S.C. § 107a(a)(6)) . . . ." Compl. at ¶ 15 (emphasis added). With the passage of time, the absence of further direction from Congress and the statutory discretion explicitly granted to the Secretary, the alleged staffing mandates should not be regarded as a "ministerial duty" that is free from doubt. Plaintiffs offer no contemporary legislative command to comply with these previously directed staffing levels, apart from the 1980 transfer of R-S Act duties to EDD. Compl. at ¶ 16. Current congressional concerns about approach, about the failure to act or about the absence of action by EDD do not necessarily relate to staffing levels and certainly do not amount to legislative command. As Plaintiffs concede, the staffing directives were linked to Congress' evaluation of the program at the time of its passage of the legislation. Compl. ¶¶ 14-16. It is axiomatic that these evaluations were subject to change. Actions taken in 1974 or thereafter by EDD, or its predessessor (the Department Health, Education and Welfare) could have satisfied congressional concerns so that the staffing requirements actually fulfilled their purpose. See Compl. at ¶ 18. Under the circumstances, what Plaintiffs posit as a "a breach of a non-discretionary duty" (Pls Opp. at 1) is more accurately the exercise of discretion by a Cabinet Secretary that is not subject to mandamus relief, since there is no clear right to relief and no clear duty to act. See Consolidated Edison, 286 F.3d at 605.[3]

---

[3] Moreover, given the statutory scheme that creates administrative arbitration, set forth in our discussion below, there is another adequate remedy.

**B.    The Individual And Organizational Plaintiffs Do Not Have Standing.**

The judicial power of United States Courts is limited to the resolution of "cases" or "controversies." U.S. Const. Art. III, § 2, cl. 1. A vital aspect of the case or controversy requirement is that the plaintiff have standing to sue. See, e.g., Allen v. Wright, 468 U.S. 737, 750 (1984); Warth v. Seldin, 422 U.S. 490, 498-99 (1975). Article III standing requires that the plaintiff have suffered (1) an "injury in fact" that is (a) "concrete and particularized" and (b) "actual and imminent, not conjectural or hypothetical," (2) which is "fairly traceable" to the challenged conduct and (3) "likely" to be "redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). These requirements apply whether an organization asserts standing on behalf of its members or on its own behalf. Nat'l Treasury Employees Union v. United States (NTEU), 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)).

The plaintiff, as the party invoking federal jurisdiction, has the burden of establishing its standing. Natural Resources Defense Council v. Peña, 147 F.3d 1012, 1020 (D.C. Cir. 1998); see Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 98 (1993) (initial burden of establishing trial court's jurisdiction rests on party invoking jurisdiction). "[A] party must . . . affirmatively allege in his pleadings the facts showing the existence of jurisdiction and the court must scrupulously observe the precise jurisdictional limits prescribed by Congress." CFTC v. Nahas, 738 F.2d 487, 492 n. 9 (D.C. Cir. 1984). See also Fed. R. Civ. P. 8(a)(1) (requiring "short and plain statement of the grounds upon which the court's jurisdiction depends"). Here, Plaintiffs' complaint appears to invoke both "associational" standing (i.e., based on the interests of the organizational Plaintiff's members) and "organizational" standing (i.e., based on the organizational Plaintiff's own interests, independent

of its members).  In particular, the complaint alleges that all of the additional duties that Congress

imposed on the Department under the R-S Act in 1974 "were for the benefit of the individual

Randolph-Sheppard vendor plaintiffs and the members of the organizational Plaintiff."  Compl. at

¶ 15.  This bare allegation, and any similar to it, do not satisfy requirements for Article III standing.

Plaintiff, as an advocacy group, has associational standing to sue on behalf of its members

if "its members would otherwise have standing to sue in their own right, the interests it seeks to

protect are germane to the organization's purpose, and neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit."  Fund Democracy, LLC

v. SEC, 278 F.3d 21, 25 (D.C. Cir. 2002); see Hunt v. Washington State Apple Advertising

Comm'n, 432 U.S. 333, 342-43 (1977).  Plaintiff's claim to associational standing founders on the

first of those elements.

### 1.    **Plaintiffs' Injuries are Not Fairly Traceable to Actions by RSA**.

The Supreme Court has consistently held that a plaintiff must establish three elements to

demonstrate standing to sue the federal government for failure to carry out its executive functions.

Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S.

464, 472 (1982); see also National Wrestling Coaches Assoc. v. U.S. Department of Education, 263

F. Supp. 82, 105-106 (D.D.C. 2003); see also Simon v. Eastern Ky. Welfare Rights Organization,

426 U.S. 26, 41-42 (1976).  First, the plaintiff must show that he or she has suffered an "'injury in

fact' – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and

(b) 'actual or imminent' not 'conjectural' or 'hypothetical.' "  Lujan, 504 U.S. at 560; see also

Bensenville v. FAA, 376 F.3d 1114, 1118-1119 (D.C. Cir. 2004).  Second, the alleged injury must

be "fairly trace[able] to the challenged action of the defendant, and not…the result [of] the

independent action of some third party not before the court." Lujan, 454 U.S. at 560 (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41-42 (1976); see also Florida Audubon Society v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996). Third, the alleged concrete injury must be "likely to be redressed by a favorable decision" of the court hearing the matter. Valley Forge, 454 U.S. at 472; see also Florida Audubon Society, 94 F.3d at 661.

In Lujan, the Supreme Court stated that the test for standing is especially demanding where, as here, plaintiffs allege consequences that are not necessarily caused by the Defendants. "When . . . as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed." Lujan, 504 U.S. at 562 (emphasis in original). Accordingly, "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict,'" id. (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)), "and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Lujan, 504 U.S. at 562.

Here, even if Plaintiffs could show that the staffing levels in RSA for the R-S Act did not meet statutory requirements and affected RSA's administration of the program, Plaintiffs would still lack standing because they cannot show that their alleged injuries regarding contracts with third parties were fairly traceable to these staffing levels. Accordingly, Plaintiffs' position is similar to the plaintiffs in Crete Carrier Corp. v. Environmental Protection Agency, 363 F. 3d 490 (D.C. Cir. 2004). In Crete Carrier, operators of five large-haul truck fleets challenged the Environmental Protection Agency's refusal to reconsider the 2004 Standard for nitrous oxide and nonmethane

hydrocarbon emissions from "'heavy heavy-duty'" diesel engines. Because the trucking companies failed to show that their injury was fairly traceable to the 2004 Standard, the court dismissed their petition for lack of standing under Article III.

Plaintiffs in this case face the same problem. They have offered nothing but speculation to suggest that the blind vendors subject to the R-S Act would enjoy changed circumstances if Plaintiffs were to prevail in this case. Significantly, Plaintiffs disregard the scheme devised by Congress to implement the Act as well as the importance of direct actions by parties not before this Court in resolving issues arising under the Act.

Plaintiffs' brief in Opposition attempts to place the entire onus of the Randolph-Sheppard program's success on the shoulders of RSA. The R-S Act does not contemplate, as Plaintiffs suggest, that technical assistance and guidance from RSA is the sole mechanism for resolution of issues involving blind vendors. In fact, SLAs are charged with administering the program within their States, and thus play a critical role in implementing the Act. The implementing regulations of the R-S Act require SLAs to promulgate rules and regulations that are adequate to assure the effective conduct of the State's vending facility program. See 34 C.F.R. 395.4(a). The SLA must have policies and standards for identifying suitable locations for vending facilities on Federal property in its jurisdiction. 34 C.F.R. 395.3(a)(3). The SLA also is responsible for issuing the licenses to blind vendors that make them eligible for the priority to operate vending stands on Federal property provided by the Act. 34 C.F.R. 395.7. In addition, the SLA must establish policies on the promotion and training of blind vendors, which assure that their maximum vocational potential is achieved. 20 U.S.C. 107d-4 and 34 C.F.R. 395.3(a)(7) and (8). Finally, SLAs are charged with resolving issues that are raised by the blind vendors through the State fair hearing

process established by the Act. Only when the blind vendor is dissatisfied with the results of the State fair hearing, can the blind vendor seek relief through the arbitration process. 20 U.S.C. 107d-1(a).

In sum, licensed blind vendors rely on the SLA to provide most of the day-to-day support they need in establishing and operating vending stands. The SLA's responsibility is significant because the blind vendors have no direct relationship with the Federal agencies. Under the Act, the SLA enters into permits and contracts with federal agencies for the operation of vending facilities. 34 CFR 395.16 and 395.33. The SLA then selects the appropriate licensed blind vendors to operate the vending facilities.

Thus, the SLAs are charged under the Act with promoting the opportunities of blind vendors and protecting them against any wrongdoings by the Federal agencies. In contrast, RSA is responsible for promulgating rules and regulations implementing the Act, conducting surveys on employment opportunities for the blind and evaluations of Randolph-Sheppard program activities, designating a State licensing agency (SLA) for blind vendors in each State, and fulfilling other oversight responsibilities. 20 U.S.C. 107a(a). No provision in the R-S Act authorizes RSA officials, acting alone, to resolve issues arising under the Act between blind vendors, SLAs, and Federal agencies.

For example, the arbitration provisions in the Act demonstrate that Congress has implemented a framework for resolving disputes between these parties that does not involve direct intervention by agency officials; rather, RSA convenes arbitration panels to resolve disputes between the blind vendor and the SLA and between SLAs and Federal agencies. Specifically, the Act authorizes "[a] ny blind licensee who is dissatisfied with any action arising from the operation or

9

administration of the vending facility program . . . [to]. . . submit to a State licensing agency a request for a full evidentiary hearing." 20 U.S.C. 107d-1(a).  A licensed blind vendor dissatisfied with the results of that evidentiary hearing can file a complaint with the Secretary, who shall convene a panel to arbitrate the dispute.  Id.  After its convening, the arbitration panel's duty is to: in accordance with the provisions of 5 U.S.C. chapter 5, subchapter II, give notice, conduct a hearing, and render its decision which shall be final and binding on the parties except that such decision shall be subject to appeal and review as a final agency action for purposes of the provisions of 5 U.S.C. chapter 7.  20 U.S.C. 107d-2.  (emphasis added.)  Similar provisions establish the right of SLAs to seek arbitration in disputes with Federal agencies.  20 U.S.C. 107d-1(b).

Several elements of this arbitration scheme illustrate that Congress did not expect RSA to be responsible for resolution of disputes arising under the Act.  First, the arbitration panel's decision is considered the final agency action of the Department, and neither RSA nor the Secretary of Education has any right to review the panel's decision before it becomes final.  Id.  The decision of the panel becomes final agency action even if RSA disagrees.  Id.  Under the statutory framework, the only method contemplating further RSA action involves a party appealing the final agency decision in federal court.

Furthermore, Congress recognized that, in arbitrations between SLAs and Federal agencies, the role of the arbitration panel should be to determine the existence of a violation and not to impose a remedy on the federal agency.  Specifically, section 107d-2(b)(2) of the Act states the following: If the panel appointed pursuant to paragraph 2 finds that the acts of practices of any such department "... are in violation of this Act, or any regulation issued thereunder, the head of such department . . . shall cause such acts or practices to be terminated promptly and shall take such other action as may

10

be necessary to carry out the decision of the panel." Thus, while Congress expected that any federal agency could be found to be in violation of the Act by an arbitration panel, no authority exists for the arbitration panel to enforce its decision against the agency, and there was no mechanism for RSA or the Department to take such action against another agency. In sum, under the R-S Act, RSA was powerless to resolve disputes between the parties, especially when one of the parties was another federal agency.

Under the Act, federal agencies do not make vending agreements directly with blind vendors. Rather, the Act creates two relationships – one between the Federal entity and the SLA and another between the SLA and the blind vendor. As the R-S Act makes clear, SLAs are the primary recourse for any issue facing a blind vendor. SLAs are charged with the responsibility for addressing issues that arise between blind vendors and federal agencies. In fact, the Act places a heavy burden on the SLAs to perform this function because the blind vendors have no direct relationship with the Federal agencies. Accordingly, SLAs are likely to have greater influence over the ability of state agencies to compete for contracts.

Based on the statutory framework, it is clear that the R-S Act does not envision, much less require, RSA to intervene in every dispute at the State level. Plaintiffs simply cannot point to one statutory provision in the R-S Act that holds RSA responsible for resolving a dispute between Montana and the Postal Service. See Pls Opp., Exhibit 10. More importantly, to blame RSA for the past four months for lack of closure to an ongoing dispute that had been festering since May 2003 is contrary to the R-S Act and not based in reality.

Likewise, the blind vendors in the District of Columbia have an ongoing issue with the SLA regarding vending machines that began in early 2005. Plaintiffs acknowledge that RSA convened

meetings between the parties on both May 4, 2005 and November 29, 2005 in an attempt to facilitate a resolution of this matter. Again, barely six weeks after the November 29 meeting, the affiant here is blaming RSA for the failure of this issue to be resolved. This argument is specious. Plaintiffs' affidavits do not explain how an increase in staffing levels at RSA will help resolve an intractable negotiation between two parties. Plaintiffs cannot demonstrate that their harm can be traced to RSA's actions, much less redressed by a favorable decision. Simon, 426 U.S. at 43.

Plaintiffs also have submitted a number of exhibits (Exhibits 2-3 and 7-9) referring to contract solicitations for food and mess attendant services for which the SLA "will be affirmatively prohibited from competing for the contract," in an attempt to show that RSA "does not appear to have taken any action since October 1, 2005 . . ." Brief at 7-8. These affidavits do not establish a fairly traceable harm because the legally required casual connection - between the conduct complained of and the injury - is not present. Indeed, in each solicitation, the final decision is made by the Federal agency responsible for the solicitation, not RSA. Further, any appeal by a disgruntled party in a contract solicitation, including SLAs, would be made in the form of a bid protest with the Comptroller General, 31 U.S.C. 3551-3556, or an action in the U.S Court of Federal Claims, 28 U.S.C. 1491(b), not in a complaint to RSA.

Further, with respect to these solicitations, Plaintiffs have made no attempt to show that RSA was made aware of these alleged issues and subsequently took no action. If the SLAs, the parties with the direct interest in securing contracts for cafeterias on federal property, are not doing their due diligence and identifying potential issues, RSA cannot be charged with being dilatory.

The third prong of the standing test – the "redressability" element – is not satisfied unless relief from the alleged injury is likely to follow from a favorable decision. Simon, 426 U.S. at 38.

(emphasis added). Even assuming that Plaintiffs have suffered some injury, they still cannot show that the injury is likely to be redressed by relief requested from this Court. Plaintiffs' argument fails here because it relies upon a misunderstanding of the role of RSA in assisting blind vendors.

**2.    The Individual And Organizational Plaintiffs Do Not Have Standing.**

Plaintiffs, in their Opposition, reference requirements for both mandamus standing and constitutional standing. Pls Opp. at 4. However, Plaintiffs cannot establish constitutional standing on any grounds. Plaintiffs fail to establish an "injury in fact" which is (a) concrete and particularized and (b) "actual or imminent" not "conjectural" or "hypothetical." Lujan, 504 U.S. at 560. Plaintiffs fail to satisfy the "direct injury" requirement, necessitating that "plaintiff . . . show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct." City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983) (citations omitted); see also Branton v. FCC, 993 F.2d 906, 908 (D.C. Cir. 1993).

In their Opposition Plaintiffs state:

> The Department does not appear to have taken any action since October 1, 2005, to fulfill its statutory duty to ensure that state licensing agencies are permitted to compete for these opportunities as is required by the Randolph-Sheppard Act. That failure by the Defendants injures the Plaintiffs and members of the organizational Plaintiffs who would otherwise have the opportunity to secure these cafeterias.

Pls Opp. at 7-8. In the Complaint, on the other hand, Plaintiffs claim that Defendants are in violation of proper staffing levels, not failing to promote competition for contracts. Compl. at ¶¶ 23-26. Similarly, Plaintiffs allege other "injuries" in their Opposition that relate to inaction concerning contracts or spending. Pls Opp. at 9-10. Again, Plaintiffs fail to assert how Plaintiffs are injured by the alleged lack of proper staffing levels. In addition Plaintiffs assert in a rather conclusory manner that they "will suffer injury" and that two individual Plaintiffs have suffered injury. However, based

13

on this statement, it is not clear how Plaintiffs would be injured or were injured.  See Ad Hoc Committee for Integrity in the Dept. of Energy v. Hodel, 594 F.Supp. 569 (D.D.C. 1984) ("an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court") (quoting Allen v. Wright, 468 U.S. 737, 754 (1984)).

## CONCLUSION

WHEREFORE, Defendants respectfully submit that their motion to dismiss should be granted.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

_____
R. CRAIG LAWRENCE, D.C. Bar #171538
Assistant United States Attorney

_____
OLIVER W. McDANIEL
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 616-0739

OF COUNSEL:

David Berthiaume
Jeffrey B. Rosen
Office of the General Counsel
U.S. Department of Education

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of February, 2006, I caused the foregoing Reply Memorandum to Plaintiffs' Opposition to Defendants' Motion to Dismiss and Defendants' Supplemental Motion to Dismiss to be served on Plaintiffs' Counsel by the Electronic Court Filing system or, if this means fails, then by mail, postage prepaid, addressed as follows:

**Shelly Marie Martin**
**Brown, Goldstein & Levy, LLP**
**120 E. Baltimore Street, Suite 1700**
**Baltimore, MD 21202**

_____
OLIVER W. MCDANIEL, D.C. BAR # 377360
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 616-0739